## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REBECCA BRITT,<br>909 Windwhisper Ln.<br>Annapolis, MD 21403<br><br>    *Plaintiff,*<br><br>v.<br><br>WASHINGTON METROPOLITAN<br>AREA ("WMATA")<br>METRO TRANSIT POLICE<br><br>Serve:<br><br>WMATA<br>Office of General Counsel<br>600 5ᵗʰ St. NW<br>Washington, DC  20001<br><br>    *Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No.:<br><br>    JURY TRIAL DEMANDED |

## COMPLAINT FOR INJUNCTIVE RELIEF
## AND COMPENSATORY DAMAGES

Comes now Plaintiff, Rebecca Britt (hereinafter "Plaintiff" or "Ms. Britt), by and through

undersigned counsel, with her Complaint for damages against her employer, Washington Metro

Area Transit Police (hereinafter "Defendant," "Metro Transit Police" or "MTP"), alleging

discrimination and retaliation based on race in violation of Title VII of the Civil Rights Act of

1967, 42 U.S.C. § 2000(e*) et seq.*, and Civil Rights Act of 1889, 42 U.S.C. § 1981, by and through

§ 1983, and states as follows:

## INTRODUCTION

Plaintiff is one of a handful of Black women who has served long enough and successfully enough to reach the rank of Lieutenant at the MTP. Throughout her tenure, she has seen and experienced a pattern, practice and culture of devaluing and dismissing the concerns of African American Transit Police officers, of unfairly and excessively disciplining them, and of harassing and retaliating against those who oppose the disparate treatment of African American officers. Specifically, when Plaintiff began working for Deputy Chief Stephen Boehm (hereinafter "DC Boehm"), she became the target of a racist and retaliatory campaign against her because she would not agree to use her authority to unfairly and unconstitutionally discipline Black officers under her command for DC Boehm's pleasure.

Plaintiff filed an internal EEO complaint alleging that she was being targeted by DC Boehm's because of her race and gender, and specifically because of her opposition to his campaign of racist and disparate treatment of Black officers, which was ***substantiated*** by the internal investigation. Despite the investigation corroborating that DC Boehm has and does act with racial and gender animus, MTP has taken no action against him, and continues to empower him to dole out discipline in a discriminatory way.

Moreover, by allowing DC Boehm to carry on in his biased and unfair ways, MTP has enabled DC Boehm to target Plaintiff for retaliatory investigations and disciplinary actions at his whim. Plaintiff's complaint is supported by the sworn of Lieutenant Sherry Willis, DC Boehm's ex-wife (hereinafter "Lt. Willis").

Lt. Willis' affidavit explains that DC Boehm's animus towards African Americans grew over time, and was particularly exacerbated by DC Boehm's fanatical support for Donald Trump

2

and participation in the "MAGA" movement. According to Lt. Willis, DC Boehm's resentment against African Americans became particularly pointed during the Black Lives Matter protests of 2020. It was so problematic and caused her to file for divorce. Lt. Willis' affidavit helps explain why DC Boehm has exercised his authority to harm African American officers under his authority.

As a direct result of DC Boehm's disparate treatment and campaign of retaliation, Plaintiff has suffered substantial damages and mental and emotional harm. Plaintiff now brings suit to obtain injunctive relief, requiring MTP to take appropriate action to address DC Boehm's racist actions, and to limit his ability to target Black officers for unfair and excessive discipline. She further seeks damages for the mental and emotional harm she has suffered for being the victim of a concerted and clear effort to force her out of her employment because she refused to use her authority to unfairly harm other Black officers.

## PARTIES

1.     Plaintiff is an African American woman and resident of the state Maryland. She has been employed by Defendant since 1997.

2.     Defendant is a multi-jurisdictional transit authority, that is chartered by federal statute. It is a quasi-federal agency. The Transit Police is a subunit of WMATA. It provides police and security presence throughout the Washington DC Metro footprint.

## JURISDICTION & VENUE

3.     This Court enjoys jurisdiction over this matter because it is brought pursuant to the laws of the United States against an agency of the federal government, in accordance with 28 U.S.C. §1331.

4.      Venue is proper in this Court because all acts and failures to act took place in the District of Columbia. *See* 28 U.S.C. §1391.

## EXHAUSTION OF REMEDIES

5.      Plaintiff has exhausted administrative remedies by properly filing EEOC charge number 570-2022-01076 alleging, *inter alia*, race and gender discrimination, retaliation and hostile work environment.

6.      Plaintiff received a Notice of Right to sue on or about January 5, 2023, and now timely files this action.

## RELEVANT FACTS

I.      PLAINTIFF'S WORK HISTORY

7.      Plaintiff holds a bachelors' degree in criminal justice administration from the University of the District of Columbia.  She is in the process of obtaining a master's degree in forensic science from National University.

8.      From 1989-1991, Plaintiff worked as an Administrative Assistant at the Department of the Army in the Otolaryngology Clinic at Walter Reed Hospital.

9.      From 1991 to 1997, Plaintiff worked as an Administrative Assistant for the Department of State in the Executive Office of Budget.

10.     Plaintiff was hired by WMATA on or about August 25, 1997, as a Metro Transit Police Officer.  She went to law enforcement training from August 1997 until April 1998.  She then completed ten (10) weeks of the Field Training and Evaluation Program.

11.      Plaintiff's first assignment was District One Evening Foot Patrol shift (hereinafter "District One B Section"), reporting to a Field Operations Bureau Sergeant.

12.      Plaintiff was selected for District One Day-work Foot Patrol and subsequently selected District One Day-work Mobile Patrol (hereinafter "District 1 A Section"), until April 2004.

13.      In 2003, Plaintiff took the test to become a Detective, and was fifth on the eligibility list. She was promoted to Detective in April 2004. At the time, Plaintiff was the only female Detective.

14.      Plaintiff worked in the Criminal Investigations Unit (hereinafter "CID") for approximately six years, in which she worked as a Detective and Background Investigator.

15.      In October 2009, Plaintiff participated in the Sergeant promotional process, earning the top position on the Sergeant's eligibility list. In November 2009, Plaintiff was promoted to Sergeant.

16.      Upon her request, she was transferred to midnights (hereinafter "Midnights"). At the time, she was the caregiver of an elderly parent and needed to be available during the day.

17.      Plaintiff remained on Midnights until January 2016, when she transferred back to District One B Section, working in the evenings.

18.      In late 2017, Plaintiff transferred to District Two Daywork, (hereinafter "District Two A-Section"),   This was a voluntary transfer.

19.      In May 2018, Plaintiff was promoted to Lieutenant was assigned to CID. She remained in CID until September 2019. At that time, she was involuntarily transferred to be the Section Commander-Lieutenant of District Two Day-work (hereinafter "District Two A-Section.

20.      In July 2020, Plaintiff was promoted to Acting Captain and assigned as the District Two Commander.

21.     In August 2020, Plaintiff began reporting to Deputy Chief Stephen Boehm (hereinafter "DC Boehm").

22.     Plaintiff was officially promoted to Captain on December 5, 2020, becoming the fourth African American female Captain in the history of the Metro Transit Police Department which was established in June 1976.

II.     THE CUSTOM, HISTORY AND PATTERN AND PRACTICE OF RACE AND GENDER DISCRIMINATION AT THE METRO TRANSIT POLICE DEPARTMENT.

23.     Congress established the Metro Transit Police Department (hereinafter "MTP") on June 4, 1976.

24.     Plaintiff first began working for the Defendant, there were less than twenty (20) women out of approximately two hundred fifty (250) sworn officers working for Defendant.   Of that cohort, approximately eight (8) were African American.

25.     In the years after she began working, the number of women officers fluctuated, but it was at most ten to twelve percent of the force.

26.     During her tenure, Plaintiff observed that African American women were consistently and habitually placed on the evening shifts, while the few white women were all placed on day work, which was considered easier and safer, with a more normal schedule.

27.     Furthermore, white officers were assigned to the suburbs, while African American officers were assigned to downtown and southeast Washington, DC, were considered more challenging areas.   Essentially, there was racial segregation at Metro Transit Police.

28.     Plaintiff also noted that African American women were routinely denied competitive positions for which officers had to bid, such as CID and the K-9 unit. There has only been one African American female K-9-unit officer in the history of Metro Transit Police.

29.     The Metro Transit Police has a history of denying promotional opportunities to African American women, and African-Americans in general.  Only four (4) African American women have promoted to the level of Captain or above in the history of Metro Transit Police.

30.     Plaintiff asserts that throughout her tenure, African Americans were disciplined harsher than their white counterparts, and asserts that this was a pattern and practice at MTP.

31.     For example, in approximately 2017-2018, two MTP members, one African American, and one white, contracted with each other for the African American to do private handyman work for the white officer's residential property.  After the work was done, the white officer refused to pay.

32.     According to MTP ethics rules, both members violated the department's policy.  However, the African American was terminated, but the white officer was allowed to remain on the job. Later, in a civil litigation regarding the non-payment for services, the Black member prevailed, but he was never reinstated to his position.   Despite engaging in the same ethics violation, the white officer remains employed today.

33.     The white officer, despite engaging in the same ethics violation, remains employed today.

34.     Plaintiff further noticed a pattern of disciplining African American officers when they were close to retirement to hinder their retirement and post-retirement job opportunities. Thus, officers and officials who had little or no discipline for decades would receive harsh and unjustified discipline at the end of their careers as a punitive and harassing measure.

35.     Plaintiff further asserts that MTP has a pattern and practice of placing disciplinary items in the employment files of African American officers and officials after they retire, which they are unaware of and have no mechanism to combat.

36.     Furthermore, MTP discriminates against African American officers and officials by denying them their retirement credentials if there is any disciplinary action in their folders before

they retire. Specifically, MTP treats African Americans differently than white officers on this issue.

37.     Plaintiff further observed that white officers were given more significant training opportunities throughout her tenure than Black officers, and more resources were made available to white officers for development outside of MTP.

38.     She also observed that women officers who chose to have a baby lost out on promotion and pay because of General Orders which would penalize them for using sick leave for maternity purposes.

III.    PATTERN AND PRACTICE OF RETALIATION

39.     Plaintiff asserts that MTP has a culture, custom, pattern, and practice of retaliating against officers who speak up about discrimination. She asserts that once an officer is viewed as a "problem child," they are sent to undesirable positions, are put in situations where they are vulnerable, and are denied special assignments, overtime, training/developmental opportunities, and promotional opportunities.

40.     Furthermore, if an officer complains about the behavior of a fellow officer, they will be isolated, bullied, and harassed for being a "rat."

41.     When officers entered into training, they were warned that what happens in the department must remain in the department. MTP has a General Order of dubious constitutional merit that prohibits officers from speaking to the media about anything.

42.     While MTP has never been responsive to the complaints of Black officers, it has been particularly and uniquely unresponsive to the concerns and complaints of Black women, who have

8

raised complaints about the way they are treated, and even when there is substantial evidence that there is merit to their claims, are ignored by senior leadership.

43.     Black women are at the bottom of the totem pole at MTP, are subjected to the harshest disciplinary actions, and are the least likely to be promoted into management.

44.     When Black women do complain, they are retaliated against in both large and small ways, that makes it very difficult to continue working for MTP.

IV.     PLAINTIFF'S OPPOSITION TO DC BOEHM'S DISPARATE TREATMENT AND RACIST AND SEXIST ACTIONS

45.     In approximately 2020, during one of the daily conference calls attended by Captain Nopadon McKee (hereinafter "Cpt. McKee"), Plaintiff and DC Boehm, DC Boehm instructed Plaintiff to proofread and edit all of Cpt. McKee's reports and investigations, before they were sent to DC Boehm, which essentially doubled Plaintiff's work volume.

46.     Plaintiff complied with the request and ended up taking on this unusual additional writing duty.

47.     Nevertheless, despite the extra work, DC Boehm disparaged Plaintiff during meetings in which Plaintiff was absent because some of her reports needed to be on time, and praised Cpt. McKee, and more specifically, praised how well Cpt. McKee's reports were written, knowing that it was Plaintiff's editing that made them "pristine."

48.     Other department employees became so aware that Plaintiff had to re-write or substantially edit the work of others, they called Plaintiff DC Boehm's "admin 'ho."

49.     When Plaintiff complained to DC Boehm about the extra burden placed on her, he ignored her complaints, and made comments such as "That's what being a Captain is all about," and "This builds your leadership skills."

50.     Eventually, Plaintiff refused to continue doing the work of her colleagues, having complained to her superiors that DC Boehm's expectation that she carry a heavier work burden than others was both racist and sexist.

51.     Plaintiff asserted that expecting the only Black woman captain to be the "admin ho," perpetuated stereotypes, and unfairly burdened Plaintiff.

52.     Plaintiff observed DC Boehm was biased against her and would lead his superiors to believe that she did something in error, when it was DC Boehm's actions that were erroneous.

53.     DC Boehm undermined Plaintiff in other ways, including denying her proper staffing. For example, while Cpt. McKee was given two Lieutenants to report to him and manage the workload of their sections and district, Plaintiff often had no Lieutenants assigned to her district, or was given only one who was on light duty and not working full time.

54.     When Plaintiff complained about being under-staffed and under-resourced, DC Boehm would make statements such as "Well, that's what makes you a strong captain," "This builds your leadership skills," essentially asserting that Plaintiff did not have the right to be treated in the same way as her colleague and should consider it a compliment that she had to work so hard.

55.     Plaintiff asserts that DC Boehm denied her proper staff and resources because of her race and her gender.

56.     Eventually, after numerous complaints, DC Boehm assigned Plaintiff an African American female Lieutenant, Monica Hockaday (hereinafter "Lt. Hockaday") with whom DC Boehm had a personal history and animus.

57.     Rather than allowing Plaintiff to manage Lt. Hockaday as needed, DC Boehm continued to demand the Plaintiff discipline Lt. Hockaday for things that were either not substantiated, not work related, or not worthy of discipline.

58.     Eventually, Plaintiff did have cause to discipline Lt. Hockaday, but did so because of work related matters which were substantiated by the Plaintiff's direct knowledge and observation.

59.     Because Plaintiff would not unfairly discipline Lt. Hockaday without cause, DC Boehm began to retaliate against Plaintiff for not carrying out his discriminatory and retaliatory orders.

60.     Due to the Plaintiff's refusal to carry out racist and retaliatory actions against Lt. Hockaday, DC Boehm threatened to demote Plaintiff, threatened to rescind her position, screamed at her over the phone, attempted to bully and intimidate Plaintiff, and launched baseless and unfounded disciplinary action against her.

61.     Specifically, DC Boehm demanded Plaintiff discipline Lt. Hockaday for remaining in her office, and for delegating minor calls for service, because she was the Day-work Watch Commander.

62.     Plaintiff refused to carry out DC Boehm's unjustified order because Lt. Hockaday was properly completing her administrative duties for her section.

63.     Additionally, the Lt. Hockaday's white colleagues behaved in the same manner, or even to a greater extent, but their actions were not questioned or condemned.  Plaintiff was not willing to engage in disparate treatment.

64.     DC Boehm then threatened Plaintiff with disciplinary action, threatened to have her demoted and stated that Plaintiff would regret defying him, when she refused to carry out his unfair and discriminatory order.

65.     From that point on, DC Boehm was constantly undermining Plaintiff's authority, and questioning her performance and leadership as a form of retaliation.

66.     Plaintiff asserts that DC Boehm also demanded that the other Black Lieutenants who worked for him use their position to harshly, unfairly and/or unjustifiably discipline Black officers,

and that DC Boehm used Black officials to carry out his racially motivated schemes to camouflage the racism within the action. In short, DC Boehm would hide his own racist intentions behind the Blackness of the officials he coopted and coerced into carry them out.

67.     DC Boehm's racial animus against African Americans manifest in other ways as well. For example, the protocol at MTP for upcoming personnel transfers was for the supervisor to notify the member being transferred of the action *prior* to the dissemination of an official memorandum.

68.     DC Boehm so disliked an African American Lieutenant working for him, that he passed off the obligation to notify the Lieutenant of the transfer to Plaintiff, who was not in the Lieutenant's chain of command.

69.     At the time of the notification, the Lieutenant reported directly to DC Boehm. While this may seem like a minor slight, in the culture of the department, it was a very visible and obvious slap in the face to the transferred Lieutenant.

70.     It was also obvious that Plaintiff was given the task to notify the transferred Lieutenant because of her race.

71.     Notably, MTP employees who witnessed it were so offended by DC Boehm's animus that they confronted him and others about his offensive behavior and disregard of protocol and past practices towards the Black Lieutenant.

72.     On numerous occasions, DC Boehm would repeatedly yell, and engage in totally inappropriate comportment towards Plaintiff, humiliating her in front of co-workers, and creating a hostile and combative work environment.

73.     DC Boehm did not limit his bullying and harassing of Plaintiff to her work location. When Plaintiff was on leave or taking days off, DC Boehm would contact Plaintiff to inquire about minor

work-related matters, which he did not do to Plaintiff's white colleagues.  DC Boehm would also berate and bully Plaintiff if something displeased him.

74.    Additionally, DC Boehm singled Plaintiff out to micromanage her work, using a harsh and hostile tone of voice with her, while not treating any of her colleagues in the same manner.

75.    On two occasions, DC Boehm intentionally undermined Plaintiff's authority as the Evening Watch Commander, ignoring her position of authority as the highest ranking MTP member, and the voice of the Chief in his absence.

76.    He regularly disregarded the chain of command and contacted officials outside of his bureau of a lesser rank to circumvent Plaintiff's responsibility and authority. This behavior disregarded the chain of command and humiliated Plaintiff to her subordinates.

77.    On numerous occasions, DC Boehm purposely avoided communication with African American officials.  For example, during a carjacking investigation, DC Boehm circumvented an African American Lieutenant who was the highest ranking official working for CID present at the crime scene.

78.    The Lieutenant was a direct report to DC Boehm and possessed relevant information regarding the investigation.  DC Boehm called a white Lieutenant outside of his area of responsibility to retrieve the information on the incident.

79.    Essentially, DC Boehm usurped the authority of two African American officials, all because of his own racism and discomfort in speaking and dealing with African Americans.

80.    DC Boehm also intentionally undermined Plaintiff when she was executing her duties, causing her embarrassment to her colleagues to question her work throughout the enterprise.

81.     DC Boehm's racist animus and pettiness rose to the level of denying Plaintiff the recognition and award that all of her colleagues received for their work during the January 6, 2021 insurrection.

82.     At the time, DC Boehm claimed he was "unaware" that Plaintiff assisted the U.S. Capitol Police during the incident.   As her supervisor, DC Boehm had ongoing communication with the Plaintiff regarding the incidents that affected WMATA and the security of its assets.

83.     Furthermore, as a leader, Plaintiff had to submit several reports documenting the event of 1/6, which DC Boehm reviewed and approved.

84.     Thus, DC Boehm's claim that there was some innocent explanation for denying Plaintiff an earned award was patently false.

85.     In order to stymie Plaintiff's advancement, DC Boehm repeatedly lied about Plaintiff's performance and her actions, in ways that were clearly verifiable and debunked by the records.


V.     POST-COMPLAINT RETALIATION AGAINST PLAINTIFF

86.     On or about July 20, 2021, Plaintiff was finally transferred from the direct supervision of DC Boehm.   The following business day, she filed an internal EEO complaint, alleging that DC Boehm harbored racist animus against African American employees, and that he discriminated against Plaintiff because of her race and gender, and her opposition to his racist behavior.

87.     MTP EEO conducted an extensive investigation, interviewing several officers/employees, and ultimately ***substantiated the claim***, which is extremely rare.

88.     Plaintiff initially believed that if she waited to file her EEO complaint until after she was out of DC Boehm's command, she would avoid his retaliation.   She was mistaken.

89.    After filing her EEO complaint, Plaintiff was subjected to clear and escalating campaign of retaliation in the form of repeated baseless and disruptive administrative investigations against her, initiated by DC Boehm, who was then the Commander of the Office of Professional Responsibilities and Inspections (Internal Affairs).

90.    DC Boehm forwarded the bogus allegations against Plaintiff to her supervisor, demanding disciplinary action against her.

91.    After each investigation, Plaintiff was exonerated, but DC Boehm's retaliatory campaign was not curbed.

92.    In addition to generating frivolous investigations against Plaintiff, DC Boehm engaged in a whisper campaign, speaking to other sworn members about Plaintiff, and actively discouraging them from supporting her, or working with her.

93.    Since filing her EEO complaint, Plaintiff has encountered DC Boehm's continuous efforts to humiliate her, undermine her credibility, isolate her from her colleagues, and stymie her ability complete work-related matters.

94.    Plaintiff's negative encounters with DC Boehm became a daily, constant thing, so pervasive that they got in the way of Plaintiff doing her job, undermined her authority, and obstructed her ability to be an effective leader.

95.    In April of 2022, Plaintiff asked for a meeting with Chief Michael Anzallo (hereinafter "Chief Anzallo") to speak about DC Boehm's racism and sexism, and the retaliation she was subjected to.  Chief Anzallo claimed he was waiting for documents from Dan Bryan (hereinafter "Mr. Bryan"), who was in charge of EEO, to decide what action to take against DC Boehm.

96.    To date, no action has been taken against DC Boehm, and in fact, DC Boehm has been given even more power to discriminate against Black and female officers.

97.     The hostile work environment DC Boehm has created has become so severe that Plaintiff had to take substantial leave, and sought out mental health counseling to deal with the constant stress of DC Boehm's campaign of personal, professional and character attacks upon her.

98.     Plaintiff's treating health care provider noted that Plaintiff's blood pressure was being negatively affected by the work stress, which was caused by the hostile environment she was enduring on the job.

## VI.     SWORN AFFIDAVIT IN SUPPORT PLAINTIFF'S CLAIMS

99.     Plaintiff is not the only person who has warned the Chief Anzallo about DC Boehm's improper behavior.  Other management personnel have also spoken to Chief Anzallo about DC Boehm's animus towards African American officers.

100.    Additionally, DC Boehm's ex-wife, Lt. Willis, has also submitted a sworn affidavit explaining that DC Boehm's animus towards African Americans extended to her sons from a previous relationship, and that it was exacerbated by DC Boehm's embrace of Donald Trump and the MAGA movement.  *See* EXHIBIT 1.

101.    According to Lt. Willis, DC Boehm has made racist statements and expressed racial hostility, especially around the Black Live Matter protests in 2020, that caused her to end their relationship.

102.    Furthermore, on or about December 13, 2021, Lt. Hockaday filed suit against MTP alleging race discrimination, retaliation and hostile work environment.  *See Hockaday v. WMATA*, Case No. 1:21-CV-03265 (TNM).  In that complaint, Plaintiff Hockaday specifically identifies DC Boehm as one of the officials who discriminated against her.  That case is still pending.

16

## CLAIMS

COUNT I

**(Violation of Title VII of the Civil Rights Act of 1967
42 U.S.C. § 2000e, *et seq.* Race Discrimination – Disparate Treatment)**

103.    Plaintiff incorporates and references all allegations in the previous paragraphs as if fully restated herein.

104.    Plaintiff is an African American female, and as such is a member of a protected class.

105.    Plaintiff was subjected to disparate terms and conditions of employment than her white counterparts, because of her race, African American.

106.    Plaintiff was required to execute her duties, and the duties of her colleague, Cpt. McKee, without being compensated or even recognized for doing the extra work.

107.    Additionally, because of her race, DC Boehm mandated that Plaintiff execute disciplinary actions against other Black officers that were unfair or completely unjustified.

108.    DC Boehm did not make such demands on non-African American subordinates.

109.    By forcing Plaintiff to engage in unethical and unlawful conduct because her race would act as a shield and deflection of DC Boehm's racial animus, DC Boehm treated Plaintiff disparately than her non-Black colleagues.

110.    Defendant's policy and historic pattern and practice of doling out harsher or unjustified disciplinary action to Black officers was known to the MTA Chief, and he took no steps to remedy it.

111.    DC Boehm's acts towards Plaintiff and her Black subordinates created a very hostile and stressful work environment for Plaintiff.

112.   As a direct and proximate cause of the disparate treatment Plaintiff was subjected to, Plaintiff suffered from severe mental stress and anxiety, such that she required intervention from a medical provider.

113.   Plaintiff asks this Court to award him compensatory and equitable damages, of not less than $300,000.00 plus all attorney's fees, court costs and interest.

114.   Plaintiff also asks this Court for injunctive relief in the form of an ORDER mandating that MTP removes DC Boehm from any role or position in which he can exercise authority over others and/or carry out racially biased actions against subordinates.


COUNT II

**(Violation of Title VII of the Civil Rights Act of 1967**
**42 U.S.C. § 2000e, *et seq.* Race Discrimination -- Retaliation)**

115.   Plaintiff incorporates and references all allegations in the previous paragraphs as if fully restated herein.

116.   Plaintiff is an African American female, and as such is a member of a protected class.

117.   Plaintiff engaged in protected activity when she opposed and refused to execute DC Boehm's racially biased and unjustified disciplinary actions against her subordinates.

118.   Plaintiff also engaged in protected activity by filing an internal EEO complaint against DC Boehm, which was investigated and ***substantiated***.

119.   Plaintiff was retaliated against by being subjected to a hostile work environment so severe and pervasive that it undermined her ability to do her job, obstructed her authority, subjected her to constant and daily humiliations, and rendered her workplace intolerable.

120.   Plaintiff was also retaliated against by way of DC Boehm's campaign of false and fabricated allegations against her, leading to disruptive and needless investigations against her.

18

121.    The combination of being constantly undermined, attacked, humiliated, disparaged and falsely accused of wrongdoing created a hostile work environment for Plaintiff.

122.    As a direct and proximate cause of the retaliatory hostile work environment that Plaintiff was subjected to, Plaintiff suffered from severe mental stress and anxiety, such that she required intervention from a medical provider.

123.    Plaintiff asks this Court to award him compensatory and equitable damages, of not less than $300,000.00 plus all attorney's fees, court costs and interest.

124.    Plaintiff also asks this Court for injunctive relief in the form of an ORDER mandating that MTP removes DC Boehm from any role or position in which he can exercise authority over others and/or carry out racially biased actions against subordinates.

## COUNT III

### (Violation of Title VII of the Civil Rights Act of 1967
### 42 U.S.C. § 2000e, *et seq.* Race Discrimination – Hostile Work Environment)

125.    Plaintiff incorporates and references all allegations in the previous paragraphs as if fully restated herein.

126.    Plaintiff is an African American female, and as such is a member of a protected class.

127.    Plaintiff was subjected to a hostile work environment so severe and pervasive that it undermined her ability to do her job, obstructed her authority, subjected her to constant and daily humiliations, and rendered her workplace intolerable.

128.    Plaintiff was also subjected to a hostile work environment because of DC Boehm's campaign of false and fabricated allegations against her, leading to disruptive and needless investigations against her.

19

129.   The combination of being constantly undermined, attacked, humiliated, disparaged and falsely accused of wrongdoing created a hostile work environment for Plaintiff.

130.   As a direct and proximate cause of the hostile work environment that Plaintiff was subjected to, Plaintiff suffered from severe mental stress and anxiety, such that she required intervention from a medical provider.

131.   Plaintiff asks this Court to award her compensatory and equitable damages, of not less than $300,000.00 plus all attorney's fees, court costs and interest.

132.   Plaintiff also asks this Court for injunctive relief in the form of an ORDER mandating that MTP removes DC Boehm from any role or position in which he can exercise authority over others and/or carry out racially biased actions against subordinates.

COUNT IV

**(Violation of 42 U.S.C. Section 1981, enforced via Section 1983**
**Based on a Violation of the Fifth Amendment to the Constitution**
**as Applied to the District of Columbia –**
**Hostile Work Environment)**

133.   Plaintiff incorporates and references all allegations in the previous paragraphs as if fully restated herein.

134.   Plaintiff is an African American female, and as such is a member of a protected class.

135.   As an employee of WMATA, Plaintiff has a contractual relationship with Defendant, in which he was denied Constitutional fair treatment because of her race.

1.   Plaintiff alleges that WMATA holds and maintains a custom, and pattern and practice of systemic race discrimination against African American officers, and further states that this custom

is so long-standing and pervasive that it has formed a barrier to retention and promotion of African American officers as demonstrated by statistical data.

2.    Plaintiff was subjected to disparate terms and conditions of employment than her white counterparts, and was subjected to a hostile work environment because of her race, and her opposition to racial discrimination.

3.    On a daily basis, Plaintiff was subjected to denigrating comments, mocking, bullying hostility, attacks on her work and micromanagement, and racially hostile comments.

4.    The hostility and negative treatment that Plaintiff was subjected to was consistent, constant and sufficiently severe as to interfere with her ability to do her job, and modify the terms and conditions of her employment.

5.    The hostile and humiliating treatment Plaintiff was subjected to, caused her severe mental and emotional anguish.

6.    Plaintiff was singled out for negative treatment by DC Boehm because she opposed racial injustice and refused to unfairly discipline African American officers.

7.    The ultimate decision maker for the MTP, Chief Anzallo, was aware and on notice of DC Boehm's racism, and his targeting of Plaintiff for harassment and retaliation.  Chief Anzallo was also given evidence of DC Boehm's racism by way of the substantiated internal EEO investigation.

8.    Despite this evidence, and that lawsuit filed by Lt. Hockaday in December of 2021, Chief Anzallo has adopted inaction on race discrimination as his default and customary position.

9.    In refusing to take any action against DC Boehm, and continuing to empower DC Boehm to harm African American officers, Chief Anzallo was acting under color of law.

10.     As a direct and proximate cause of Chief Anzallo's actions, Plaintiff was substantially incumbered in her ability to enforce her employment contract with MTP, as a direct result of her opposition to race discrimination, and because of her race, African American.

11.     As a direct and proximate cause of Chief Anzallo's choices, Plaintiff has suffered lost wages, lost benefits, damage to his reputation, mental anguish and emotional stress.

12.     Plaintiff seeks to enforce his rights under 42 U.S.C. § 1981, by asserting the instant claim under 42 U.S.C. § 1983, based on the Fifth Amendment to the Constitution as it relates to the District of Columbia.

13.     Plaintiff asks this Court to award her compensatory and equitable damages, cost and fees, and attorney's fees of not less than $300,000.00.

14.     Plaintiff also asks this Court for injunctive relief in the form of an ORDER mandating that MTP removes DC Boehm from any role or position in which he can exercise authority over others and/or carry out racially biased actions against subordinates.


COUNT V

**(Violation of Title VII of the Civil Rights Act of 1967
42 U.S.C. § 2000e, *et seq.* Gender Discrimination – Disparate Treatment)**

136.     Plaintiff incorporates and references all allegations in the previous paragraphs as if fully restated herein.

137.     Plaintiff is an African American female, and as such is a member of a protected class.

138.     Plaintiff was subjected to disparate terms and conditions of employment than her male counterparts, because of her gender.

139.     Plaintiff was required to execute her duties, and the duties of her colleague, Cpt. McKee, without being compensated or even recognized for doing the extra work.

22

140. Additionally, because of her gender, DC Boehm mandated that Plaintiff execute disciplinary actions against other Black female officers that were unfair or completely unjustified.

141. By forcing Plaintiff to engage in unethical and unlawful conduct because her gender would act as a shield and deflection of DC Boehm's gender animus, DC Boehm treated Plaintiff disparately than her male colleagues.

142. Defendant's policy and historic pattern and practice of doling out harsher or unjustified disciplinary action to Black female officers was known to the MTA Chief, and he took no steps to remedy it.

143. DC Boehm's acts towards Plaintiff and her Black female subordinates created a very hostile and stressful work environment for Plaintiff.

144. As a direct and proximate cause of the disparate treatment Plaintiff was subjected to, Plaintiff suffered from severe mental stress and anxiety, such that she required intervention from a medical provider.

145. Plaintiff asks this Court to award him compensatory and equitable damages, of not less than $300,000.00 plus all attorney's fees, court costs and interest.

146. Plaintiff also asks this Court for injunctive relief in the form of an ORDER mandating that MTP removes DC Boehm from any role or position in which he can exercise authority over others and/or carry out sexist actions against subordinates.

## COUNT VI

### (Violation of Title VII of the Civil Rights Act of 1967
### 42 U.S.C. § 2000e, *et seq.* Gender Discrimination -- Retaliation)

147. Plaintiff incorporates and references all allegations in the previous paragraphs as if fully restated herein.

148.    Plaintiff is an African American female, and as such is a member of a protected class.

149.    Plaintiff engaged in protected activity when she opposed and refused to execute DC Boehm's sexist and unjustified disciplinary actions against her subordinates.

150.    Plaintiff also engaged in protected activity by filing an internal EEO complaint alleging gender discrimination against DC Boehm, which was investigated and ***substantiated***.

151.    Plaintiff was retaliated against by being subjected to a hostile work environment so severe and pervasive that it undermined her ability to do her job, obstructed her authority, subjected her to constant and daily humiliations, and rendered her workplace intolerable.

152.    Plaintiff was also retaliated against by way of DC Boehm's campaign of false and fabricated allegations against her, leading to disruptive and needless investigations against her.

153.    The combination of being constantly undermined, attacked, humiliated, disparaged and falsely accused of wrongdoing created a hostile work environment for Plaintiff.

154.    As a direct and proximate cause of the retaliatory hostile work environment that Plaintiff was subjected to, Plaintiff suffered from severe mental stress and anxiety, such that she required intervention from a medical provider.

155.    Plaintiff asks this Court to award him compensatory and equitable damages, of not less than $300,000.00 plus all attorney's fees, court costs and interest.

156.    Plaintiff also asks this Court for injunctive relief in the form of an ORDER mandating that MTP removes DC Boehm from any role or position in which he can exercise authority over others and/or carry out racially biased actions against subordinates.

COUNT VII

**(Violation of Title VII of the Civil Rights Act of 1967
42 U.S.C. § 2000e, *et seq*. Gender Discrimination – Hostile Work Environment)**

157.   Plaintiff incorporates and references all allegations in the previous paragraphs as if fully restated herein.

158.   Plaintiff is an African American female, and as such is a member of a protected class.

159.   Plaintiff was subjected to a hostile work environment so severe and pervasive that it undermined her ability to do her job, obstructed her authority, subjected her to constant and daily humiliations, and rendered her workplace intolerable.

160.   Plaintiff was also subjected to a hostile work environment because of DC Boehm's campaign of false and fabricated allegations against her, leading to disruptive and needless investigations against her.

161.   The combination of being constantly undermined, attacked, humiliated, disparaged and falsely accused of wrongdoing created a hostile work environment for Plaintiff.

162.   DC Boehm created this hostile work environment for Plaintiff because of her gender, and because MTP has historically tolerated and enabled disparate and discriminatory treatment towards women officers.

163.   As a direct and proximate cause of the hostile work environment that Plaintiff was subjected to, Plaintiff suffered from severe mental stress and anxiety, such that she required intervention from a medical provider.

164.   Plaintiff asks this Court to award her compensatory and equitable damages, of not less than $300,000.00 plus all attorney's fees, court costs and interest.

165.   Plaintiff also asks this Court for injunctive relief in the form of an ORDER mandating that MTP removes DC Boehm from any role or position in which he can exercise authority over others and/or carry out sexist actions against subordinates.

**PRAYER FOR RELIEF**

Plaintiff therefore makes the following prayer for relief to the Court:

- Compensatory damages for each claim asserted herein of not less than $300,000.00.

- An award to compensate Plaintiff for all medical costs and expenses incurred as a result of Defendant's unlawful conduct.

- An award of attorney's fees, and all costs incurred with litigation.

- An ORDER mandating that Defendant remove DC Boehm from any position in which he can use his authority to target and harm African American and/or female officers.

- An ORDER mandating that Defendant hire an outside consultant to conduct a three hundred sixty degree review of Defendant's employment culture, and provide recommendations to the Court for how Defendant can improve its treatment of African American and female officers.

- An ORDER mandating that Chief Anzallo, and all Deputy Chiefs attend training to improve their comprehension of EEO policies and requirements.

**JURY TRIAL**

Plaintiff demands trial by jury on all claims so triable.

Respectfully submitted,

/s/ **Pamela M. Keith**
Pamela M. Keith
CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Ave. NW
Suite 600
Tel: (202) 800-0292
Fax: (202) 807-5275
pamkeith@centerforemploymentjustice.com
*Counsel for Plaintiff*

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SWORN AFFIDAVIT OF
LIEUTENANT SHERRY WILLIS

I, **Sherry Willis**, being of sound mind and over the age of eighteen (18), do hereby assert that the following facts are personally known to me, and that I would testify to the same if called upon to do so in this matter:

1.     I am an African American woman, and am employed by WMATA as a Metro Transit Police Officer.

2.     I was first hired by WMATA in April 2002.  I went to basic law enforcement training from April through December 2002.

3.     During my career, I was promoted to sergeant in 2008 and lieutenant in 2015.

4.     My assignments include field training officer, emergency management liaison, canine training coordinator, and training commander and section commander.

5.     I currently serve as the District 2, A Section Commander, responsible for the day-to-day management of day work officers and sergeants.

6.     In 2009, I began dating Deputy Chief Stephen Boehm (hereinafter "Stephen"), who is a white male, and was a sergeant at the time.  We began a friendship, and then a romantic relationship, but only socialized outside of work.

7.     In 2016, we got married.  I have two sons from previous relationships.  At the time of my marriage to Stephen, my sons were 11 and 14 years old.  My sons are also African American.

8.     When Stephen and I first got married, he had a good relationship with my sons, especially my younger son.  They often did things together.

1

9.     In 2017, things in the marriage started to change.  I noticed that Stephen spent less time with my sons because they were getting to be teenagers.  But also, that Stephen began to resent my sons, and say disparaging and critical things about them to me.

10.     About that time, I also noticed that Stephen spent a lot more time at work with Deputy Chief Kevin Gaddis (hereinafter "DC Gaddis").

11.     DC Gaddis was a rigid and intolerant person, who was known for favoritism towards those he liked, and targeting those he disfavored. DC Gaddis would say things that were just on the border of offensive, and would often pit people against each other. DC Gaddis would co-opt and use his subordinate officials to carry out his vendettas against those he disfavored. I noticed that Stephen began to pick up these traits.

12.     In late 2016, tension between Stephen and I began to escalate because of his open and enthusiastic support for Donald Trump to be President, which bonded him to people at work, especially DC Gaddis.

13.     Stephen and I had frequent arguments about Trump and why I, and many other Black people, saw Trump as extremely racist.  I began to understand that Stephen and I saw the world very differently.

14.     I learned that the way to maintain peace in my household was to completely avoid the topic as much as possible.  That mostly worked for a period of time, but there was still underlying tension in our relationship.

15.     However, my sons were not as able to avoid his derision, and the way he started talking about them was horrifying to me.

16.     My oldest son is a good young man, who has completed school.  When he and his friends would be at the house, Stephen would complain about the number of "grown men" hanging at his

house and would treat them with suspicion.  They had done nothing to deserve that kind of treatment.

17.     My oldest son began to complain to me about the tensions with Stephen.  He also did not appreciate Stephen's constant, vocal support for Trump and the MAGA movement.

18.     In 2019 things started to come to a head.  By that time, there were many issues in our marriage, but Stephen's constant racist and denigrating comments, and Trump fanaticism exacerbated and accelerated the breakdown of our marriage.  It was a huge issue between us.

19.     In the Spring of 2020, while the Black Lives Matter protests were going on, I concluded that I could no longer live with a man who harbored such animus and hatred towards Black people, and who genuinely did not believe that Black lives actually matter.

20.     We were no longer able to communicate, and I was no longer able to ignore the reality that my husband's affection for me was despite my race, not in full embrace of it.  And whatever he felt for me, did not extend to my sons, whom he believed were to be treated with the same level of suspicion as all other Black men.

21.     My ex-husband was comfortable with me because I was in a subordinate role to him in our careers.  But that did not extend to our married life, and that started to be a real problem.

22.     I left Stephen in May of 2020, basically giving up our home and everything in our union because I could no longer tolerate his world view and bitterness towards Black people.

23.     I understood that in leaving him, I was going to greatly damage my career and ability to promote because of his power at WMATA, and his ability to retaliate against me in subtle ways.

24.     I have not filed any claims against him, largely because his power is exercised by and through other people.  After the divorce, I just wanted to keep my head down, and to do my job and not make waves.

25.     I have worked with Captain Rebecca Britt (hereinafter "Cpt. Britt"), and know that she works directly from Stephen.  Cpt. Britt and I are not close, and we do not socialize outside of work.

26.     I have heard that she has been subjected to harassment and bullying by Stephen, and I suspect that such is true because Cpt. Britt is a confident Black woman, which would irritate Stephen.

27.     In our relationship, I saw that Stephen expected to be deferred to in all things by me, and other Black people, but that he would bend himself to accommodate and agree with people like DC Gaddis.

28.     From my experience and observation, Stephen takes things very personally, and is driven by revenge and payback for perceived slights.  He holds grudges.  He can also be petty and immature.

29.     On or about February 27, 2023, Cpt. Britt and I had a short conversation while at a meeting, in which I learned about her case against Stephen, and I asked if there was anything I could do to help.  She put me in touch with her counsel.

30.     I submit this affidavit because I think it's important to tell what I know of Stephen's biases and motivations.  During the time that I was intimately involved with him, I observed Stephen become ever deeper and more aligned with white supremacist and racist ideology, and attest that, based on his conversations with me, his world view has bled into his professional life, and the way he views Black workers at WMATA.

31.     I have heard Stephen state that his relationship with me proves that he is not racist.  The opposite is true.  His relationship with me revealed more than I ever thought possible, that he harbors deep racial prejudices and biases against Black people.

And further, Affiant sayeth not.

I, *Sherry Willis*, do hereby swear or affirm, under the penalties of perjury, that the foregoing

is true and accurate to the best of my knowledge.

03/06ᵗʰ 2023
Date

Lieutenant Sherry Willis

5